Argued and submitted October 6, 2008, remanded for reconsideration March 19, petition for review denied July 9, 2009 (346 Or 363)

## EMPLOYMENT DEPARTMENT,
*Petitioner,*

*v.*

## NATIONAL MAINTENANCE CONTRACTORS OF OREGON, INC.,
*Respondent.*

Employment Division - Tax Section
T70805; A134773

204 P3d 151

Denise G. Fjordbeck, Senior Assistant Attorney General, argued the cause for petitioner. With her on the briefs were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

John Glowney argued the cause for respondent. With him on the briefs were P.K. Runkles-Pearson and Stoel Rives LLP.

Before Edmonds, Presiding Judge, and Brewer, Chief Judge, and Wollheim, Judge.

BREWER, C. J.

**BREWER, C. J.**

The Employment Department petitions for judicial review of the final order of an administrative law judge (ALJ) that set aside a notice of tax assessment issued by the department to National Maintenance Contractors of Oregon, Inc. (NMC). The final order determined that NMC's franchisees—janitors who performed services at buildings owned by third parties—did not perform those services for NMC "for remuneration" and were therefore not NMC's employees for purposes of unemployment insurance taxes. *See* ORS 657.030(1) (providing that, unless the context requires otherwise, and subject to certain exceptions, " 'employment' means service for an employer * * * performed for remuneration or under any contract of hire, written or oral, express or implied"). For the reasons that follow, we remand the order for reconsideration.

We take the relevant facts primarily from the ALJ's findings of fact, which the parties do not challenge on judicial review. NMC is a janitorial franchisor that has operated in Oregon since 1978. NMC enters into agreements with building owners to provide janitorial services and informs the owners that the services will be provided by its franchisees. Although NMC often enters into a contract for an entire building, it generally does not assign the building to one franchisee but instead splits identifiable parts of the building among various franchisees.

The cost of an NMC franchise is determined by the volume of monthly billing for the accounts that NMC assigns to the franchisee. NMC does not guarantee that the franchisee will receive a specific account, and all accounts serviced under the franchise must be serviced pursuant to an agreement between the building owner and NMC. Franchisees are not permitted to enter into direct contractual relationships with the building owners—a prohibition that continues for 12 months after the termination of a franchise.

All franchisees are required to sign a written franchise agreement, and each agreement contains essentially the same terms. Under the agreement, it is contemplated that building owners will pay NMC directly for the janitorial

services. NMC then deducts a royalty, an "office management fee," and a liability insurance premium. If a franchisee obtains an account for NMC, the franchisee can pay a reduced royalty and office management fee. After deducting its fees, NMC twice per month forwards the balance of the building owner's payment to the franchisee. The franchise agreement provides that any interest earned on the money received from building owners belongs to NMC. Nothing in the franchise agreement requires NMC to pay a franchisee if a building owner fails to pay for services.

Under the franchise agreement, NMC must replace lost accounts, or reductions in monthly billings on those accounts, during the first year of the franchise agreement. The franchisee can extend that guarantee by paying a higher royalty fee. The franchise agreement expires on termination of the franchisee's accounts or five years from the date of the agreement. The franchisee has the right to renew the agreement subject to certain conditions, including payment of a renewal fee.

The franchise agreement also allows the franchisee to sell, transfer, or assign its franchise, subject to NMC's approval. NMC retains the right of first refusal, which allows it to purchase the franchise from the franchisee on the same terms offered to the prospective buyer. If NMC finds a buyer for the franchise, the selling franchisee must pay NMC 20 percent of the transfer price; if the selling franchisee finds the buyer, the selling franchisee must pay NMC 10 percent of the transfer price.

For its part, NMC provides office management services, including billing, collection, inspection reports, record maintenance, and training and advice. NMC must provide initial training to a franchisee and any of the franchisee's employees at no cost within 30 days after signing the agreement. If the franchisee hires new employees after that time, those new employees must complete a training program with NMC (at a cost of $150) or the franchisee must demonstrate to NMC that the employee has received adequate substitute training. A franchisee employee who has not completed satisfactory training is not permitted to service NMC accounts. NMC also provides liability insurance to its franchisees.

NMC requires franchisees to accept its office management services and liability insurance.

With respect to materials, NMC provides franchisees with a list of "required equipment, materials, and supplies" needed to service accounts, as well as a "list of such items by brand name or type that meet [NMC's] quality standards * * *." The franchisee, in turn, must purchase and maintain the equipment and supplies as specified. If a franchisee wishes to use other types of equipment or supplies, the franchisee must provide a list of those items to NMC before the franchisee receives initial training. NMC must approve the use of substitute items. NMC also provides a list of appropriate dress for servicing accounts.

Pursuant to the agreement, franchisees have an obligation to "maintain NMC's image." They must secure doors and exits after leaving the premises of an account, and they must "abide by all of the terms and conditions of [the franchise agreement] and [NMC's] manuals and oral or written directives and instructions." The franchise agreement also lists 17 specific acts of default. In the event of such a default, NMC has the right to assign the accounts to another franchisee, terminate the franchise agreement, suspend the franchisee for up to six months, and charge the franchisee for the cost of any cleanup caused by the act of default.

On a number of occasions during the past 20 years, various state and federal agencies have issued decisions concerning the nature of the relationship between NMC (or its predecessor, a Washington corporation) and its franchisees. One of those decisions is particularly pertinent to our discussion. In 1985, a referee for the Oregon Employment Division issued a decision concluding that franchisees of Lyle Graddon (NMC's founder and president) and NACOR, doing business as National Maintenance Contractors of Oregon, were "not in a relationship of employer-employee or a status that could be construed to be 'employment' as defined by ORS 657.030."

In 2005, the Employment Department conducted an audit of NMC for the years 2002 through 2004. Following that audit, the department issued a notice of tax assessment to NMC for unemployment insurance taxes that NMC owed for its franchisees during that period. NMC disputed the

assessment and requested a hearing before an ALJ. At that hearing, NMC argued that (1) its franchisees were not "employees" within the meaning of the unemployment insurance statutes, and (2) the department was precluded from litigating the issue because of the previous administrative proceedings.

The ALJ rejected NMC's arguments with respect to issue preclusion, on the ground that the previous administrative cases involved different parties and different issues. However, the ALJ agreed with NMC's contention that its franchisees were not "employees." Specifically, the ALJ concluded that "[t]he franchisees covered by the audit *did not perform services for remuneration for NMC*. They were thus not employees under ORS 657.030. NMC is therefore not required to pay unemployment insurance taxes on those individuals." (Emphasis added.) For that reason, the ALJ set aside the department's notice of tax assessment. The ALJ explicitly declined to reach NMC's alternative contention that, even if the franchisees performed services for remuneration, they nevertheless came within the independent contractor exception to the definition of employment. *See* ORS 657.040(1) ("Services performed by an individual for remuneration are deemed to be employment subject to this chapter unless and until it is shown to the satisfaction of the Director of the Employment Department that the individual is an independent contractor, as that term is defined in ORS 670.600.").

The department now seeks review of the ALJ's order, arguing that the ALJ erred in concluding that NMC's franchisees did not perform services for NMC for remuneration. In response, NMC reprises its arguments below to the effect that its franchisees are not its employees because the franchisees do not provide services for NMC and do not receive remuneration from NMC. NMC also cross-assigns as error the ALJ's refusal to give the 1985 administrative decision preclusive effect in this case.

The first question before us—whether NMC's franchisees provide services to NMC for remuneration—is ultimately one of statutory construction, involving a number of related statutory provisions. Oregon employers must pay

unemployment insurance taxes into the Unemployment Compensation Trust Fund "on all wages paid for services." ORS 657.505(2). The term "wages" is defined in ORS 657.105(1) as "all remuneration for employment, including the cash value, as determined by the Director of the Employment Department under the regulations of the director, of all remuneration paid in any medium other than cash." The term "employment," "unless the context requires otherwise, and subject to [certain statutory exclusions]," means "*service for an employer * * * performed for remuneration or under any contract of hire*, written or oral, express or implied." ORS 657.030(1) (emphasis added).[1] If an individual provides services to an employer for remuneration, the burden is on the employer to demonstrate that the service comes within an enumerated exception to the definition of employment, such as the "independent contractor" exclusion in ORS 657.040(1). *See* ORS 657.030(3), ORS 657.040 - 657.094 (setting forth various exceptions to the definition of "employment").

We have previously observed that the meaning of ORS 657.030 turns on the proper interpretation of "inexact" terms, which we discern as a matter of law by reference to the rules of construction ordinarily applicable to statutes. *Necanicum Investment Co. v. Employment Dept.*, 214 Or App 385, 388-89, 164 P3d 1197 (2007), *rev'd on other grounds*, 345 Or 138, 190 P3d 368 (2008). Those rules of construction require us to determine the meaning most likely intended by the legislature, looking first to the text of the statutes in context and, if necessary, to their enactment history and other aids to construction. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993).

The Supreme Court has specifically identified the general legislative intent underlying ORS 657.030(1): "[T]he legislature did not intend to incorporate the common law test

---

[1] Similarly, ORS 657.015 defines the term "employee" as

"any person * * * employed for remuneration or under any contract of hire, written or oral, express or implied, by an employer subject to this chapter in an employment subject to this chapter. 'Employee' does not include a person who volunteers or donates services performed for no remuneration or without expectation or contemplation of remuneration as the adequate consideration for the services performed for a religious or charitable institution or a governmental entity."

for determining the master-servant relationship. Rather, the test is to be found by looking at the purpose of the [Unemployment Insurance] Act." *Kirkpatrick v. Peet*, 247 Or 204, 212, 428 P2d 405 (1967) (footnote omitted). That purpose, the court explained, "is served only if the Act is construed broadly enough to include persons who, *although independent contractors according to the common law test, are peculiarly subjected to the hazard of unemployment because of the nature of their occupation.*" *Id.* (emphasis added). Thus, as a policy matter, the legislature has elected to define "employment" broadly and then has carved out specific, enumerated exceptions to that definition in the case of particular industries or circumstances. *See, e.g.*, ORS 657.030(3); ORS 657.040 - 657.094.

With that framework and legislative policy in mind, we turn to the meaning of the specific terms used in the definition of "employment" in ORS 657.030. Once again, the statute describes "employment," in part, as "service for an employer * * * performed for remuneration or under any contract of hire * * *." ORS 657.030. As we have previously explained, "[i]n ordinary parlance, a 'service' is 'an act done for the benefit or at the command of another,' an act that 'provide[s] information or other assistance,' *Webster's Third New Int'l Dictionary* 2075 (unabridged ed 2002)[.]" *Necanicum*, 214 Or App at 391. Similarly, the Supreme Court has held, in the context of an earlier but similarly worded version of the unemployment compensation statutes, that "service" is "a broad term of description 'evidencing a legislative intent to give to the [Unemployment Compensation] Act a broad and liberal coverage to the end that the far-reaching effects of unemployment may be alleviated.' " *Journal Pub. Co. v. State U. C. Com.*, 175 Or 627, 636, 155 P2d 570 (1945) (citation omitted).

"Remuneration," in turn, commonly refers to " 'pay[ing] an equivalent to (a person) for a service, loss, or expense[.]' " *Necanicum*, 214 Or App at 391 (quoting *Webster's* at 1921).[2] Like the word "service," remuneration is

---

[2] Although the Supreme Court ultimately reversed our decision in *Necanicum* —a matter discussed in more detail later in this opinion, 226 Or App at 485-86, it did not voice any disagreement with our analysis of the plain meaning of the terms "service" or "remuneration."

used "advisedly as one of broad meaning in order that the objects of the [Unemployment Compensation] Act might be achieved." *Journal Pub. Co.*, 175 Or at 657.

■ Here, the ALJ concluded that, although the franchisees performed a service for NMC (by fulfilling NMC's contractual obligation to perform janitorial services at various buildings), NMC did not pay remuneration to the franchisees. On review, the parties take issue with both aspects of the ALJ's conclusion, NMC contending that the franchisees did not provide services for NMC or receive remuneration for those services; the department contending that the franchisees performed services for NMC and were, in fact, remunerated for them.

On the question whether the franchisees provided services to NMC, we agree with the ALJ. NMC entered into contracts with building owners to provide janitorial services for those buildings. NMC then entered into separate agreements whereby the franchisees would perform those janitorial services on behalf of NMC, thereby discharging NMC's contractual obligations to the building owners.[3] That is, NMC essentially subcontracted with its franchisees to provide janitorial services to the building owners.[4] The Supreme Court has recognized that the legislature intended the term "service" to encompass that type of beneficial relationship, whereby an employer has contracted with an individual for

---

[3] In *Journal Pub. Co.*, 175 Or at 640, the court examined a number of cases from Utah, because the Utah's unemployment compensation statutes were "in substance identical with [Oregon's]." One of those cases, which *Journal Pub. Co.* quotes extensively and cites with approval, "involved a contract called a 'franchise agreement'" between a dairy product company and its dealer. 175 Or at 641 (quoting *Creameries of America, Inc. v. Industrial Commission*, 98 Utah 571, 102 P2d 300, 302 (1940)). In *Creameries of America, Inc.*, the court reasoned that the franchise agreement was a contract to perform personal services for remuneration, even though the dealer was supposedly buying products from the company and reselling them to certain customers. 175 Or at 642 (discussing *Creameries of America, Inc.*, 102 P2d at 305). The court explained that the dealer "'could acquire no customers for himself; though he was entitled to remuneration for any he might acquire for the employing unit. Certainly, the distribution or "reselling" of [the company's] dairy products to [the company's] customers was performing "services" for [the company] within the meaning of the Act.'" *Journal Pub. Co.*, 175 Or at 642 (quoting *Creameries of America, Inc.*, 102 P2d at 305).

[4] In fact, Graddon, the founder and president of NMC, testified at the hearing that "the accounts are essentially a subcontract to the franchisee to do some of the work under that contract."

personal services that discharge the employer's obligations to third parties. *See, e.g., Journal Pub. Co.*, 175 Or at 639 (holding that a newspaper carrier provided service to the newspaper company by delivering newspapers on behalf of the newspaper company; "[i]t goes without saying that subscribers who do not receive their papers would soon cease to be subscribers"); *Columbia Management Co. v. Morgan*, 270 Or 109, 118-19, 526 P2d 571 (1974) (explaining that "the provisions of the [unemployment compensation statutes] have been broadly construed in cases in which it has been contended that the individual persons who perform services are 'independent contractors' "; also, recognizing that "one may be the employer of an individual for the purposes of this act even though the wages of such an individual are paid by someone else, either directly or indirectly"); *see also Kirkpatrick*, 247 Or at 213 (door-to-door salespeople working in the capacity of "dealers" for a vacuum distributor provided service to the distributor). Accordingly, we conclude that the franchisees performed janitorial services that were for "the benefit or at the command of" NMC, that is, services for NMC.

■     We turn, then, to the question of remuneration. The ALJ appears to have reached the conclusion that NMC did not pay remuneration to the franchisees based primarily on the fact that "[n]othing in the franchise agreement requires NMC to pay a franchisee if a building owner fails to pay for services." In the department's view, the ALJ incorrectly focused on the risk of nonpayment and ignored the contractual relationships at play:

> "In plain terms, NMC paid the janitors. They were not paid by the building owners; the building owners owed the janitors no contractual duty to pay. The janitors did not receive payment directly and then pay NMC for its management and franchise services. The flow of money followed the contractual relationships: building owner to NMC, NMC to franchisee-janitor."

NMC, on the other hand, contends that the path of payment—that is, from NMC to the franchisees—"does not change the fact that the building owners pay the franchisees for their services."

We conclude that the department has the better argument. Under the terms of the franchise agreement, NMC collects payment from building owners for janitorial services pursuant to a contractual relationship *between NMC and the building owners*. Then, pursuant to the terms of a separate contract—the franchise agreement—NMC "will pay [its franchisee] the amount [NMC] collects from Franchisee's Accounts for Franchisee's services, after deducting the fees described below [for royalties, 'office management,' and liability insurance]." The payment from NMC to its franchisees, though calculated based on the services provided by franchisees to building owners, is paid, as a matter of contract, *by NMC to its franchisees*. In fact, NMC prohibits its franchisees from entering into direct contractual arrangements with building owners that would alter that payment arrangement; moreover, the franchise agreement gives NMC significant control over which buildings are assigned to the franchisees: "Franchisor may at any time replace one or more Accounts with other Accounts that have substantially equivalent monthly billings."[5]

The service agreements between NMC and the building owners further undermine NMC's contention that the building owners paid the franchisees. Those agreements indicate that NMC is itself furnishing janitorial services and that the payment by the building owner must be made *to NMC* for services *provided by NMC*. For example, one of the services agreements states that NMC, referred to as "Contractor," is "engaged in the business of furnishing building services, including cleaning service, parking lot maintenance, construction and associated maintenance services." That agreement further provides that "Owner agrees to pay Contractor as full compensation for its services under this agreement the sums indicated * * *." Another service agreement provides that NMC "agrees to perform the herein specified cleaning and maintenance services for the Project * * *."

---

[5] NMC, pursuant to the franchise agreement, also has the right to retain any interest on the payments from the building owners, a right of ownership of those funds that belies NMC's contention that the building owners are paying the franchisees rather than NMC.

That agreement, rather than referring to franchisees performing the work, refers to NMC's "employees."[6] With respect to "pricing," the agreement states that "[t]he total monthly price to be *paid to the Contractor for performing these services* will be as follows * * *." (Emphasis added.)

The above terms of the franchise agreement, coupled with the terms of the building service contracts, lead us to conclude that the building owners do not pay franchisees for janitorial services; rather, the building owners pay NMC for those services, and NMC then pays the franchisees remuneration in exchange for fulfilling NMC's contractual obligations. The arrangement, albeit a product of a "franchise agreement," is functionally equivalent to a subcontract, whereby remuneration flows from building owner to janitorial contractor and from janitorial contractor to janitorial subcontractor. And, given the broad meaning of ORS 657.030(1) intended by the legislature—one that encompasses certain common-law independent contractor service arrangements—we conclude that the relationship between NMC and its franchisees involves the payment of remuneration for services.[7]

As noted, the ALJ relied heavily on the fact that NMC allocated to its franchisees the risk of nonpayment by the building owners. The Supreme Court, however, has explicitly rejected the proposition that "compensation for services ceases to be remuneration because the individual

---

[6] For example, the agreement requires NMC to "bond all employees in the amount of $35,000 per employee" and to "provide uniforms for all employees, which indicate thereon the name of the Janitorial Contractor."

[7] *Golden Shear Barber Shop v. Morgan*, 258 Or 105, 481 P2d 624 (1971), a case in which the Supreme Court concluded that an apprentice barber had not provided services to his supervising barber for remuneration, is also instructive. In that case, the court explained that

"the amount of business done by [the apprentice] made no difference to [the supervisor's] income or the volume of his business. [The apprentice] did not bring [the supervisor] new customers and did not serve [the supervisor's] own customers. None of the barbers, including [the supervisor], could profit from the contributions [the apprentice] made to the common fund * * *. These facts do not disclose an employment relationship, but a bona fide space-sharing arrangement * * *."

*Id.* at 112-13. Here, by contrast, the amount of business done by the franchisees did affect NMC's income; the franchisees served NMC's existing customers; and the franchisees could bring NMC new customers.

performing the services agrees, in effect, to assume a measure of risk of loss resulting from the delinquencies of his employer's customers." *Journal Pub. Co.*, 175 Or at 659. In this case, NMC has simply conditioned the franchisees' remuneration on NMC's ability to first obtain payment from the building owners, but the payments, when made, nevertheless constitute remuneration for services. *See Kirkpatrick*, 247 Or at 207-08 (door-to-door salesman provided services for remuneration to a vacuum distributor where the salesperson's "remuneration was the difference between what he paid the [distributor] and the price for which the machine was sold to the customer").

For the reasons stated above, we conclude that NMC's franchisees provide services to NMC and receive remuneration from NMC for those services. Still, our analysis of ORS 657.030 is not complete. As the Supreme Court recently explained in *Necanicum*, the statutory definitions of "employee," "employer," and "employment" that are part of the unemployment insurance and taxation scheme contain an important proviso: the phrase "unless the context requires otherwise." 345 Or at 145; *see* ORS 657.015(1); ORS 657.025(1); ORS 657.030(1).

As the court explained, the phrase "unless the context requires otherwise" means that, "in some cases, the circumstances of a case may require the application of a modified definition of the pertinent statutory terms to carry out the legislature's intent regarding the statutory scheme." *Necanicum*, 345 Or at 143. In *Necanicum*, the question was whether the directors of a corporation were "employees" of the corporation for purposes of the unemployment compensation and taxation scheme: "Accordingly, if the directors fall within the definition of 'employee,' set forth in ORS 657.015, in that they are *employed for remuneration by the corporation*, the payments are subject to unemployment tax, *'unless the context requires otherwise.'*" *Id.* (first emphasis in original; second emphasis added). For that reason, the court turned to the statutes regulating corporations to determine how the legislature defined the nature of the relationship between a corporation and its directors.

After examining various provisions of ORS chapter 60 (governing corporations), as well as ORS 657.044 (establishing an unemployment insurance and taxation exemption for certain corporate officers who are also directors), the court held:

"Informed by the legislature's description of the relationship between directors and corporations, we conclude that on the record before us there is no employer-employee relationship between a corporation and its directors when the directors are performing the duties imposed on them by statute. Directors exercise 'all corporate powers' and direct the management of a corporation's business and affairs, but directors do not take direction from any officer or agent of the corporation. Directors cannot be hired or fired by the corporation, but are elected and may be removed by the shareholders of a corporation. A corporation may decide not to provide remuneration for its directors at all; when it does provide such remuneration, that action by itself does not make a director an 'employee' for purposes of the unemployment tax. To be sure, a director may also be an employee of a corporation if the director is hired to perform other services, however, a director acting only in that capacity is not an employee.

"We hold that the legislature did not intend to include corporate directors, serving solely as directors, within the statutory definition of an 'employee' of a corporation for purposes of the unemployment tax, *because directors are not 'employed by' the corporation in the same sense as other persons who perform 'service for an employer * * * for remuneration.'* ORS 657.030."

*Necanicum*, 345 Or at 145 (emphasis added).

In that light, we must consider whether the context of the franchise agreement in this case requires us to depart from the ordinary meaning of the term "employment." Initially, we note that franchise sales are regulated by Oregon statute. *See* ORS chapter 650 (governing franchise transactions). ORS 650.005(4) defines the term "franchise" as follows:

" 'Franchise' means a contract or agreement, whether oral or written, by which:

"(a)   A franchisee is granted the right to engage in the business of offering, selling or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor;

"(b)   The operation of the franchisee's business pursuant to such plan or system is substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising or other commercial symbol designating the franchisor of such plan or system; and

"(c)   The franchisee is required to give to the franchisor a valuable consideration for the right to transact business pursuant to the plan or system. Payment for trading stamps in itself is not consideration for the right to transact business pursuant to a plan or system."

"Franchisee" is defined as "a person to whom a franchise is sold by a franchisor." ORS 650.005(5). "Franchisor" is defined as "a person, including a subfranchisor, who sells a franchise for $100 or more to a franchisee or subfranchisor." ORS 650.005(6).[8]

Thus, the legislature has recognized that, at least for purposes of regulating the sale of franchises, the franchisor-franchisee relationship is a specific type of contractual relationship in which the franchisee "is required to give to the franchisor a valuable consideration for the right to transact business pursuant to the plan or system." ORS 650.005(4)(c). That is, consideration in the sale of a typical franchise agreement is paid by the *franchisee to the franchisor*. Moreover,

---

[8] 16 CFR section 436.1(h) defines "franchise" for purposes of federal regulations concerning the sale of franchises:

"Franchise means any continuing commercial relationship or arrangement, whatever it may be called, in which the terms of the offer or contract specify, or the franchise seller promises or represents, orally or in writing, that:

"(1) The franchisee will obtain the right to operate a business that is identified or associated with the franchisor's trademark, or to offer, sell, or distribute goods, services, or commodities that are identified or associated with the franchisor's trademark;

"(2) The franchisor will exert or has authority to exert a significant degree of control over the franchisee's method of operation, or provide significant assistance in the franchisee's method of operation; and

"(3) As a condition of obtaining or commencing operation of the franchise, the franchisee makes a required payment or commits to make a required payment to the franchisor or its affiliate."

the consideration is not paid for a service rendered but rather "for the right to transact business pursuant to [a] plan or system." *Id.*

ORS chapter 650 does not, however, provide any guidance concerning the nature of the ongoing relationship between franchisor and franchisee that results *after* the sale of the franchise. Nor are we aware of any other relevant Oregon statutes that specifically define the nature of the ongoing relationship between a franchisor and its franchisees or otherwise inform the question whether a franchise relationship and an employment relationship are necessarily mutually exclusive.[9] For that reason, ORS chapter 650 does not inform the question whether the relationship between NMC and its franchisees could also constitute an "employment" relationship. *Cf. Necanicum*, 345 Or at 144-45 (concluding, in light of the definition of the nature of the relationship between a corporation and its directors as set forth in ORS chapter 60, that directors of a corporation are not "employed by" the corporation in the same sense as other persons who perform service for an employer for remuneration).

■    We appreciate that franchises are unique business arrangements that can differ in many important ways from a traditional employment relationship. *See* Dean T. Fournaris, *The Inadvertent Employer: Legal and Business Risks of Employment Determinations to Franchise Systems*, 27 SPG Franchise LJ 224, 230 (2008) ("Franchising is a unique type of business arrangement. * * * As such, a natural tension exists between the types of franchisor controls that are inherent in franchising and the types of control over day-to-day tasks that courts and regulators traditionally evaluate to determine whether an employment relationship exists."). That said, we are not persuaded that franchise relationships demand a modified definition of service or remuneration for purposes of ORS 657.030. Rather, the question whether a particular franchise relationship satisfies that statute must

---

[9] There are statutes that define the rights and obligations of the parties to certain franchise agreements, *see, e.g.*, ORS 650.120 - 650.170 (governing motor vehicle dealerships); ORS 650.200 - 650.250 (motor fuel franchises). The franchise agreement in this case is not governed by those statutes.

be answered on a case-by-case basis, by determining whether services for remuneration have been provided and, if so, whether some exclusion to the definition of employment nevertheless applies. *See, e.g.*, ORS 657.040(1) (excluding from the definition of "employment" any services performed for remuneration by "independent contractors" within the meaning of ORS 670.600).

In sum, we conclude that NMC's franchisees do, in fact, provide services to NMC and are remunerated for those services within the broad meaning of ORS 657.030(1), and that the ALJ erred in concluding that NMC did not pay remuneration to its franchisees. The ALJ, therefore, should have reached NMC's alternative argument that its franchisees, although providing services to NMC for remuneration, nevertheless are excluded from the definition of employment because they come within the statutory "independent contractor" exclusion to the definition of "employment." ORS 657.040(1); ORS 670.600. Accordingly, we must remand the order for reconsideration of that issue—unless, of course, NMC's cross-assignment of error provides an alternative basis for upholding the ALJ's order.

In its cross-assignment of error, NMC contends that the ALJ erred in failing to conclude that the department's arguments under ORS 657.030 were precluded by a prior administrative decision, a 1985 decision by a hearings referee from the Employment Division of the Department of Human Resources. That 1985 decision involved notice of deficiency assessments issued by the division to "Lyle R. Graddon, dba National Maintenance Contractors of Oregon" and "NACOR, et al, dba National Maintenance Contractors of Oregon." The referee in that case ultimately decided:

> "The services performed by the franchisees involved herein were for the contracting customer and in behalf of their own business interest, not for applicants. The methods used in collecting and making payments for services rendered does not alter the fact that we have one business doing business with another, but not in a relationship of employer-employee or a status that could be construed to be 'employment' as defined by ORS 657.030."

In response to NMC's issue preclusion argument, the ALJ reasoned that, "[w]hile there may be some similarities between the two cases, the cases involved different parties, different franchisees, and legal standards that have changed in the intervening years." Accordingly, the ALJ concluded that the 1985 decision was not preclusive but nonetheless provided "persuasive authority" regarding the employment status of NMC's franchisees. In a cross-assignment of error, NMC argues that the ALJ's ruling in that regard was error and that the prior decision should have precluded litigation of the issue whether NMC and its franchisees were in an employment relationship within the meaning of ORS 657.030. *See Nelson v. Emerald People's Utility Dist.*, 318 Or 99, 103-04, 862 P2d 1293 (1993) (setting out the requirements for issue preclusion).

■    For issue preclusion to apply, the following requirements must be met: (1) the issue in the two proceedings must be identical; (2) the issue must have actually been litigated and have been essential to a final decision on the merits in the prior proceeding; (3) the party sought to be precluded must have had a full and fair opportunity to be heard on the issue; (4) the party sought to be precluded must have been a party or in privity with a party in the prior proceeding; and (5) the prior proceeding must have been the type of proceeding to which courts give preclusive effect. *Id.* at 104. As the party asserting issue preclusion, NMC had the burden of proving the first four of those elements. *Barackman v. Anderson*, 214 Or App 660, 666-67, 167 P3d 994 (2007), *rev den*, 344 Or 401 (2008) (describing the shifting burdens concerning issue preclusion).[10]

■    As the ALJ correctly pointed out, the 1985 proceeding involved different franchisees, under a different NMC corporate structure. As the party asserting issue preclusion, NMC had the burden of demonstrating that the issue litigated and decided in 1985 was "identical" to the issue in this case. However, on the record before us, it is not apparent that the issue of the franchisees' employment status in the 1985

___

[10] *See also* ORS 657.683(4) (providing that "the determination or assessment of the director or authorized representative shall be prima facie correct and the burden shall be on the protesting employing unit to prove that it is incorrect").

proceeding was identical to the issue in this case, given the factual differences in the proceedings. The 1985 proceeding involved different franchisees operating under different franchise agreements. Although NMC contends that the terms of the franchise agreements have not changed in any material way, the record does not establish that fact. As far as we can tell, the terms of the 1985 franchise agreements and building services agreements are not in the record before us, other than through references in the 1985 decision. Some of the referee's findings of fact suggest relevant factual differences between the 1985 proceeding and this record. For example, the referee found that "the client-customer for the janitorial services agreed to pay to [the franchisor], as agent for the 'franchisee,' the contract price on a monthly basis"; that "[w]here civil action in court was required to collect the fees for the janitorial services performed by the franchisees, it was the franchisee who had the right and responsibility to initiate this action, not applicants"; and that "[t]he legal remedy for collection of fees owed resided exclusively with the franchisee against the customer for whom the services were performed."

In this case, however, NMC has not directed us to any evidence that the building owners agreed to pay the franchisees through an agent. Rather, as set out above, the services agreements between NMC and the building owners indicate that NMC is the party contractually obligated to furnish the janitorial services and that the payment must be made to NMC for those services. Moreover, the franchise agreements in this case provide that NMC—and not the franchisees—is responsible for initiating any collection efforts in the event that the building owners do not pay for the janitorial services. Given those factual differences, the ALJ did not err in rejecting NMC's issue preclusion argument.

Finally, NMC makes the related argument that this court's decision in *Kaib's Roving R.Ph. Agency v. Employment Dept.*, 161 Or App 290, 298, 984 P2d 886 (1999), "provides a separate and independent basis for deciding in NMC's favor." In that case, the court held that the legislature, "when enacting ORS 670.600, intended that there be uniformity and consistency among the enumerated agencies when determining independent contractor status." *Id.* at 295. Here, the ALJ

expressly declined to address whether the franchisees were independent contractors within the meaning of ORS 670.600 because he concluded that the franchisees had not provided service for remuneration. Given that the ALJ has not yet determined whether the franchisees are independent contractors for purposes of ORS 670.600, NMC's arguments regarding agency uniformity are premature.

Remanded for reconsideration.