Submitted November 6, 2009, affirmed October 13, 2010

Mark GROSS,
dba Rent-A-Nerd,
*Petitioner,*
*v.*

EMPLOYMENT DEPARTMENT,
*Respondent.*

Employment Division - Tax Section
T70995; A140914

240 P3d 1130

Mark R. Gross filed the briefs *pro se*.

John R. Kroger, Attorney General, Jerome Lidz, Solicitor General, and Karla H. Ferrall, Assistant Attorney General, filed the brief for respondent.

Before Wollheim, Presiding Judge, and Brewer, Chief Judge, and Sercombe, Judge.*

SERCOMBE, J.

---

* Brewer, C. J., *vice* Edmonds, P. J.

**SERCOMBE, J.**

In this unemployment insurance tax case, petitioner, dba Rent-A-Nerd, seeks review of an order by the Employment Department (department) determining, for purposes of petitioner's liability to pay unemployment insurance taxes under ORS 657.505, that he is an "employer" under ORS 657.025 and that the computer repair technicians affiliated with his business are engaged in "employment" under ORS 657.030 through 657.094.[1] Petitioner argues that the administrative law judge (ALJ) misinterpreted the applicable statutes in making those determinations. We review for errors of law, ORS 183.482(8)(a), and affirm.

As found by the ALJ, the relevant facts are as follows:

"(1) [Petitioner] operates a business in the Lane, Linn and Benton County areas which he calls Rent-A-Nerd (RAN). RAN maintains a web site and advertises computer repair and maintenance services to businesses and area residents, and provides telephone numbers for potential customers to call. * * *

"(2) When a potential customer calls RAN, the customer generally leaves a message with the customer's name and a telephone number. [Petitioner] transcribes the message and refers it to one of several 'RAN affiliated technicians' (technicians). [Petitioner] decides which technician will receive each of the referrals. The technicians are to call [petitioner] each morning and advise the [petitioner] (usually by leaving a message) concerning whether they are available and what RAN work (if any) they have scheduled. * * *

"(3) The technician receiving the referral is to call the potential customer, learn what the problem is, arrange a meeting time, advise the potential customer concerning the RAN fee schedule (the technician may add a travel charge if the customer is outside the RAN service area) and notify [petitioner] concerning any appointment arranged. The

---

[1] In this case, petitioner contested only the department's initial Notice of Determination that he is an "employer" subject to Oregon's unemployment insurance statutes; petitioner did not contest any subsequent tax audit determining the extent of his unemployment insurance tax obligation. Thus, the issue on review is limited to his status as an employer.

technician then reports to the customer's location and fixes the problem; the technician may, at his or her discretion, take the customer's computer off site (to the technician's residence or another location of the technician's choice) if this will expedite repairs. * * *

"(4) Technicians select and pay for their own tools and provide their own transportation, at their own expense, to job sites. Technicians are free to decline referrals to potential customers, and need not have a good reason for doing so, but must promptly call [petitioner] so [petitioner] can find another technician to do the work. * * *

"(5) When a job is complete, the technician is to collect the payment on the spot (typically by check or in cash; credit and debit cards are not accepted) from the computer owner. Any check is made payable to the technician, who deposits the funds in the technician's own account. The technician issues an invoice, on a form created and provided by [petitioner], describing the work done and specifying the amount charged. If the customer's check does not clear the bank, [petitioner] may call the customer and seek alternative payment; if payment is not forthcoming, neither [petitioner] nor the technician receives anything for the work. * * *

"(6) Every two weeks, technicians are to submit their invoices to [petitioner], along with an agreed on percentage of the gross amount collected from various customers during that two week interval. If a technician submits fees to [petitioner] in excess of $200 for three consecutive two week periods, the technician may then submit a smaller percentage of any further amounts collected (after the first $200) to [petitioner]. This is referred to by [petitioner] as a 'profit sharing plan.' * * *

"(7) A 'lead technician' sometimes substitutes for [petitioner] in handling calls and making referrals. The lead technician also screens applicants who respond to [petitioner's] 'help wanted' and other advertising seeking new technicians, in order to confirm that the applicants have the training and experience required to repair computers. The lead technician is given first call on business jobs (for which the charges and potential income are higher than for residential jobs) and is permitted to keep a higher percentage of the fees for his own work in exchange for these additional services. * * *

"(8) When a new technician is approved by the lead technician and is ready to receive referrals, [petitioner] meets with the new technician and gives the new technician a copy of a document entitled 'Guide for Independent Affiliated Consultants.' This multi-page document contains detailed discussion of RAN policies and requirements, including [petitioner's] expectations for technicians. The eight main points are that technicians must protect customer data, accept responsibility for their mistakes and accidents (including vehicle accidents while driving on RAN business, for which the technicians were to obtain insurance), prohibit customers from contacting the technician except through RAN, respond quickly to referrals (and advise RAN that a response is taking place), not charge for time if the technician is 'uncertain' about a problem or doing research, arrive promptly for scheduled appointments, conform to the RAN fee schedule, and promptly pay referral fees to [petitioner]. This document, along with oral expectations given to each new technician by [petitioner], forms the contract between RAN and each technician. The terms of the agreement are not negotiable, but [petitioner] does not attempt to enforce any breach of the agreement except by discontinuing referrals to the technician involved. [Petitioner] has never sued (or been sued) over any breach of a contract between his RAN business and a technician. * * *

"(9) The Guide for Independent Affiliated Consultants also contains 13 additional numbered suggestions and directives and an underlined, emphasized statement that 'Working with Rent-A-Nerd, you are an independent contractor, and you and you alone are responsible for maintaining accurate records and for any and all liabilities and obligations your activities generate.' * * *

"(10) [Petitioner] uses a variety of methods to advertise RAN, including newspapers, coupons, direct mail, and a web site. The RAN web site contains the statement that 'We provide Quality On-Site computer help!' and the statement that 'Rent-A-Nerd is my business, which I operate as a sole proprietor, but Rent-A-Nerd is also a team of affiliated independent professional computer consultants.' * * *

"(11) If a customer is dissatisfied with work done by a technician, the customer is to call [petitioner] at the RAN telephone number. [Petitioner] then tries to learn why the customer is dissatisfied and to get the matter resolved

between the customer and the technician, whether by having the technician return for further work, refunding some or all of the amounts collected from the customer, or persuading the customer that the work was satisfactory. * * *

"(12) In February 2008, Mr. Herzog began working as a technician and accepting referrals from [petitioner]. He continued working and accepting referrals until March 26, 2008. Although Mr. Herzog paid [petitioner] the established percentage of the gross for the early referrals, he did not pay [petitioner] for the referrals during the last two weeks he did RAN work. At some subsequent time, Mr. Herzog applied for unemployment insurance benefits, and the Employment Department learned about Mr. Herzog's work as a RAN technician. The Employment Department began an investigation of [petitioner] and the RAN business, concluded that [petitioner] was the employer of Mr. Herzog and the other technicians under Oregon law, and sent a Notice of Determination advising [petitioner] that he had been found to be an employer and that his employment tax rate was to be 2.1%."

On review, petitioner disputes a number of those factual findings and points to evidence in the record that contradicts those findings. However, petitioner assigns as error *only* the ALJ's interpretation and application of pertinent statutes and does not argue that the facts, as found by the ALJ, are not supported by substantial evidence. In addition, although the department, in responding to petitioner' opening brief, states that it "relies on the ALJ's findings of fact, as corrected by petitioner," we do not understand the department to have conceded that the disputed factual findings lack substantial evidence. Therefore, we accept the facts as found by the ALJ for the purposes of our review.

■ ORS 657.505(2) makes an "employer" liable for unemployment insurance taxes "on all wages paid for services." On the above facts, the ALJ concluded that petitioner is an "employer," as defined in ORS 657.025, and that the technicians were engaged in subject "employment," as defined under ORS 657.030 through 657.094. The ALJ explained that, because tax assessments and determinations of the department are *prima facie* correct under ORS 657.683(4), petitioner had the burden to establish that he is not the employer of the person performing services for remuneration

or that he should be excluded from taxation for some other reason. *See Mitchell Bros. v. Emp. Div.,* 284 Or 449, 587 P2d 475 (1978).

Before the ALJ, petitioner argued that he is not an "employer" or an "employing unit" because the technicians perform services for the customers—and not for him— and because the technicians receive remuneration from the customers—and not from him. Petitioner also argued that he operates an advertisement and referral business and not a computer repair business. The ALJ rejected those arguments, concluding:

> "Where, as here, [petitioner] has selected those who are to perform the services, set the price for the services, sent the service providers to the locations where the services are required, and collected a percentage of the total fee for the services, the persons physically performing the services are doing so 'for' [petitioner], in the sense intended by the word 'for' in ORS 657.020 and ORS 657.025(1)."

The ALJ also concluded that the technicians are not "independent contractors," as defined by ORS 670.600, so as to fall within the exclusion from "employment" of ORS 657.040(1).

Because doing so will provide helpful context, we pause to briefly describe the interlocking statutory definitions governing the ALJ's conclusions. Under ORS 657.025(1), the term "employer" generally means "any *employing unit* which employs one or more individuals in *an employment* subject to this chapter in each of 18 separate weeks during any calendar year, or in which the employing unit's total payroll during any calendar quarter amounts to $1,000 or more." (Emphases added.) ORS 657.020(1)(a), in turn, defines "employing unit" generally as "[a]ny individual or type of organization, * * * who has or had in its employ one or more individuals performing services for it within this state." Moreover, ORS 657.030(1) defines "employment" generally as "service for an employer, * * * performed for remuneration or under any contract of hire, written or oral, express or implied."

The statutory definitions of "employer," "employing unit," and "employment" each contain the phrase "unless the

context requires otherwise," indicating that, in certain contexts, the ordinary meaning of those terms may be inapplicable and, instead, a modified definition must be applied. *See Necanicum Investment Co. v. Employment Dept.*, 345 Or 138, 142-43, 190 P3d 368 (2008) (explaining that the phrase "unless the context requires otherwise" means that, "in some cases, the circumstances of a case may require the application of a modified definition of the pertinent statutory terms to carry out the legislature's intent regarding the statutory scheme"). In addition, several statutes under ORS chapter 657 provide for specific exclusions from the definition of "employment" in certain circumstances. In particular, ORS 657.040(1) provides an exclusion from "employment" for individuals proved to be "independent contractors": "Services performed by an individual for remuneration are *deemed* to be employment subject to this chapter *unless and until it is shown* to the satisfaction of the Director of the Employment Department that the individual is an independent contractor, as that term is defined in ORS 670.600."[2] (Emphases added.)

---

[2] ORS 670.600, defining the term "independent contractor," provides, in part:

"(2) As used in ORS chapters 316, 656, 657, 671 and 701, 'independent contractor' means a person who provides services for remuneration and who, in the provision of the services:

"(a) Is free from direction and control over the means and manner of providing the services, subject only to the right of the person for whom the services are provided to specify the desired results;

"(b) Except as provided in subsection (4) of this section, is customarily engaged in an independently established business;

"(c) Is licensed under ORS chapter 671 or 701 if the person provides services for which a license is required under ORS chapter 671 or 701; and

"(d) Is responsible for obtaining other licenses or certificates necessary to provide the services.

"(3) For purposes of subsection (2)(b) of this section, a person is considered to be customarily engaged in an independently established business if any three of the following requirements are met:

"(a) The person maintains a business location[.]

"* * * * *

"(b) The person bears the risk of loss related to the business or the provision of services[.]

"* * * * *

"(c) The person provides contracted services for two or more different persons within a 12-month period, or the person routinely engages in business

On review, petitioner assigns error to the ALJ's ultimate legal conclusions that he is an "employer" and that the technicians are engaged in subject "employment," as those terms are defined under the relevant statutes. We write only to address petitioner's argument that the ALJ's conclusions are erroneous because the technicians provide computer repair services for the customers and the remuneration they receive from the customers.[3] Petitioner contends that "either the customer is the * * * technician's employer, or the customer is indeed a customer, and the * * * technician is an independent contractor." Similarly, petitioner argues that, because he provides services to the technicians in exchange for remuneration from them, the technicians are either his employers (and he is their employee) or the technicians are his customers (and he is an independent contractor).

The department responds that petitioner meets the definition of "employer" because the technicians provide a service for him and receive remuneration for that service, even though the remuneration does not come directly from petitioner. In particular, the department contends:

"The customers that [petitioner] solicits and refers to the technicians are RAN's customers, not Herzog's * * * or any other technician's customers. Thus, the technicians work for [petitioner] by servicing his customers on his behalf. He ensures that RAN customers will remain RAN customers by requiring technicians to use RAN invoices and by prohibiting them from providing direct-contact information to the customers. According to petitioner's own testimony, keeping his own customer base intact was his original purpose in identifying 'affiliated technicians' to take his referrals.

---

advertising, solicitation or other marketing efforts reasonably calculated to obtain new contracts to provide similar services.

"(d) The person makes a significant investment in the business[.]

"* * * * *

"(e) The person has the authority to hire other persons to provide or to assist in providing the services and has the authority to fire those persons."

[3] In challenging the ALJ's conclusions, petitioner makes a number of other arguments related to his ability to comply with state and federal accounting and tax laws; the ALJ's statements regarding the applicable burden of proof under ORS 657.683(4); the ALJ's exclusion of certain evidence; and the constitutionality of ORS 657.683(4). We reject those arguments without discussion.

And that is what he continues to do: refer his work to other technicians without undermining his customer base."

The department notes that petitioner has failed to challenge the ALJ's conclusion that the technicians are not independent contractors, as defined by ORS 670.600.

In his reply brief, petitioner clarifies his argument as follows:

"It is my contention that the * * * technicians are independent contractors *in relation to the customers*. It is also my contention that I am an independent contractor *in relation to the * * * technicians*. It is also my contention that I am not an employing unit in an employment relationship with the * * * technicians. As a result, *I did not attempt to use the self-employment exception to an employment relationship provided within ORS 670.600 to argue that the * * * technicians are not my employees because they are independent contractors in relation to myself*."

(Emphases added.)

Accordingly, as framed by the parties on review, we must determine what is meant by the definitions of "employing unit" under ORS 657.020(1)(a) and "employment" under ORS 657.030(1), in order to determine whether the ALJ was correct in concluding that petitioner is an "employer" under ORS 657.025(1). We need not determine whether the independent contractor exclusion of ORS 657.040(1) applies to the technicians' relationship with petitioner, so as to relieve petitioner of an employer status, because petitioner has specifically disclaimed any attempt on his part to challenge the ALJ's conclusion that the technicians are not independent contractors.

When construing a statute, our goal is to ascertain the intent of the enacting legislature by examination of the statute's text and context, along with any relevant legislative history, and if necessary, by resort to relevant canons of statutory construction. *State v. Gaines*, 346 Or 160, 171-73, 206 P3d 1042 (2009); *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993). To recall, ORS 657.025(1) defines the term "employer" generally as "any *employing unit* which employs one or more individuals in *an*

*employment* subject to this chapter * * *." (Emphases added.) Generally, the plain text of ORS 657.020(1) (defining "employing unit") and ORS 657.030(1) (defining "employment") contemplate the performance of "services" by one "for" another. In addition, the plain text of ORS 657.030(1) contemplates the performance of those services "for remuneration."

 We most recently construed the words "employment," "services," and "remuneration," as used in ORS 657.030, in *Employment Dept. v. National Maintenance Contractors*, 226 Or App 473, 204 P3d 151, *rev den*, 346 Or 363 (2009). We explained:

> "The Supreme Court has specifically identified the general legislative intent underlying ORS 657.030(1): '[T]he legislature did not intend to incorporate the common law test for determining the master-servant relationship. Rather, the test is to be found by looking at the purpose of the [Unemployment Insurance] Act.' *Kirkpatrick v. Peet*, 247 Or 204, 212, 428 P2d 405 (1967) (footnote omitted). That purpose, the court explained, 'is served only if the Act is construed broadly enough to include persons who, although independent contractors according to the common law test, are peculiarly subjected to the hazard of unemployment because of the nature of their occupation.' *Id.* * * * Thus, as a policy matter, the legislature has elected to define 'employment' broadly and then has carved out specific, enumerated exceptions to that definition in the case of particular industries or circumstances. * * *
>
> "With that framework and legislative policy in mind, we turn to the meaning of the specific terms used in the definition of 'employment' in ORS 657.030. Once again, the statute describes 'employment,' in part, as 'service for an employer * * * performed for remuneration or under any contract of hire * * *.' ORS 657.030. As we have previously explained, '[i]n ordinary parlance, a "service" is "an act done for the benefit or at the command of another," an act that "provide[s] information or other assistance," *Webster's Third New Int'l Dictionary* 2075 (unabridged ed 2002)[.]' *Necanicum [Investment Co. v. Employment Dept.*, 214 Or App 385, 391, 164 P3d 1197 (2007), *rev'd on other grounds*, 345 Or 138, 190 P3d 368 (2008)]. Similarly, the Supreme Court has held, in the context of an earlier but similarly

worded version of the unemployment compensation stat-
utes, that 'service' is 'a broad term of description "evidenc-
ing a legislative intent to give to the [Unemployment Com-
pensation] Act a broad and liberal coverage to the end that
the far-reaching effects of unemployment may be allevi-
ated." ' *Journal Pub. Co. v. State U.C. Com.*, 175 Or 627,
636, 155 P2d 570 (1945) (citation omitted).

" 'Remuneration,' in turn, commonly refers to ' "pay[ing]
an equivalent to (a person) for a service, loss, or expense[.]" '
*Necanicum*, 214 Or App at 391 (quoting *Webster's* at 1921).
Like the word 'service,' remuneration is used 'advisedly as
one of broad meaning in order that the objects of the
[Unemployment Compensation] Act might be achieved.'
*Journal Pub. Co.*, 175 Or at 657."

*Id.* at 479-81 (emphasis and footnote omitted).

In *National Maintenance Contractors*, the putative
employer (NMC) contracted with building owners to provide
janitorial services for the buildings, and NMC then assigned
franchisees to perform those services. *Id.* at 475. The building
owners paid NMC, which deducted a royalty and administra-
tive and insurance fees before forwarding the balance as pay-
ment to each franchisee. *Id.* at 475-76. NMC provided a list of
required materials for performing the work and specified
which materials met its quality standards; franchisees had to
obtain NMC's approval before using substitute materials. *Id.*
at 477. NMC also had requirements for appropriate dress for
the workers, and franchisees were obligated to abide by all
the terms and conditions of the franchise agreement and
could be suspended or charged on default. *Id.* The depart-
ment conducted a tax assessment and determined that the
franchisees were employees. *Id.* NMC requested a hearing,
and the ALJ reversed, concluding that the franchisees " 'did
not perform services for remuneration for NMC' " and thus
were not employees under ORS 657.030. *Id.* at 478 (emphasis
omitted).

On review to this court, the department challenged
that ruling by the ALJ. *Id.* at 481. Because the franchisees
had provided the services that NMC was contractually obli-
gated to perform for the owners of the buildings, we held that
"the franchisees performed janitorial services that were for
'the benefit or at the command of' NMC, that is, services for

NMC." *Id.* at 482. We went on to explain that the remuneration arrangement between the franchisees and NMC was

"functionally equivalent to a subcontract, whereby remuneration flows from building owner to janitorial contractor and from janitorial contractor to janitorial subcontractor. And, given the broad meaning of ORS 657.030(1) intended by the legislature—one that encompasses certain common-law independent contractor service arrangements—we conclude that the relationship between NMC and its franchisees involves the payment of remuneration for services."

*Id.* at 484 (footnote omitted).

Our inquiry into whether the NMC franchisees were engaged in an "employment," however, was not at an end. Because ORS 657.030(1) contains the proviso "unless the context requires otherwise," we turned to consider "whether the context of the franchise agreement * * * require[d] us to depart from the ordinary meaning of the term 'employment.' " *Id.* at 485-86. We noted initially that franchise sales in Oregon are governed by statute. *Id.* at 486. We then explained:

"ORS chapter 650 [governing franchise transactions] does not, however, provide any guidance concerning the nature of the ongoing relationship between franchisor and franchisee that results *after* the sale of the franchise. Nor are we aware of any other relevant Oregon statutes that specifically define the nature of the ongoing relationship between a franchisor and its franchisees or otherwise inform the question whether a franchise relationship and an employment relationship are necessarily mutually exclusive. For that reason, ORS chapter 650 does not inform the question whether the relationship between NMC and its franchisees could also constitute an 'employment' relationship. *Cf. Necanicum*, 345 Or at 144-45 (concluding, in light of the definition of the nature of the relationship between a corporation and its directors as set forth in ORS chapter 60, that directors of a corporation are not 'employed by' the corporation in the same sense as other persons who perform service for an employer for remuneration).

"We appreciate that franchises are unique business arrangements that can differ in many important ways from a traditional employment relationship. * * * That said, we

are not persuaded that franchise relationships demand a modified definition of service or remuneration for purposes of ORS 657.030. Rather, the question whether a particular franchise relationship satisfies that statute must be answered on a case-by-case basis, by determining whether services for remuneration have been provided and, if so, whether some exclusion to the definition of employment nevertheless applies. *See, e.g.*, ORS 657.040(1) (excluding from the definition of 'employment' any services performed for remuneration by 'independent contractors' within the meaning of ORS 670.600)."

*Id.* at 488-89 (emphasis in original; footnote omitted). Ultimately, we concluded that NMC's franchisees provided services to NMC for remuneration under the broad meaning of ORS 657.030(1) and that the ALJ erred in concluding otherwise. *Id.* at 489. Because the ALJ had not reached NMC's alternative argument that the franchisees came within the statutory independent contractor exclusion, we remanded the order for reconsideration of that issue. *Id.* at 489, 492.

Although the usefulness of fact-matching with other cases has limitations, additional guidance in applying the principles discussed in *National Maintenance Contractors* to the present case can be gained from examining two earlier precedents with analogous circumstances.[4] In *Kirkpatrick*, the putative employer, a distributor of Kirby vacuums, had contracts with several dealers, wherein the dealers agreed to sell the vacuums at retail prices. 247 Or at 207. The dealers' remuneration was the difference between the wholesale price and the retail price paid by the customer. The distributor advertised the vacuums and, when inquiries were received at his office, appointments were made for the dealers on a rotation basis. Although the agreements between the distributor and the dealers provided that the dealers would not be subject to any control of the distributor in the manner in which

---

[4] Petitioner has argued that cases that predate the 2005 amendments to Oregon's unemployment insurance law are inapplicable because they were based on interpretations of prior law. However, the amendments to which petitioner refers affected only ORS 657.040 and ORS 670.600, regarding the independent contractor exclusion. *See* Or Laws 2005, ch 533, §§ 1-2, 4. Because the amendments did not affect the statutory definitions of "employing unit," "employer," or "employment," *see* ORS 657.020, ORS 657.025, and ORS 657.030, the amendments do not disturb the precedential value of earlier cases that construe those terms.

each dealer's business was conducted, the distributor frequently went with the dealers to observe the dealers' methods of selling and to make suggestions for improvement of selling techniques. *Id.* at 207-08. If a dealer made a sale on credit, the customer would make a down payment by check, payable to the distributor, and the dealer would turn that check into the distributor's office, after which the dealer would receive a "commission." *Id.* at 208. The Supreme Court, in determining whether the distributor was an "employer" subject to ORS chapter 657, held that "[t]he facts clearly establish that the dealers were employed by plaintiff to perform services for which they received remuneration." *Id.* at 213.

By contrast, in *North Pacific Supply Co., Inc. v. Emp. Div.*, 100 Or App 553, 557, 787 P2d 495, *rev den*, 310 Or 121 (1990), we held that the service provided to the putative employer, a distributor of RCA and Whirlpool appliances, by retail salespersons was "too indirect to be intended by the [unemployment insurance] act to constitute 'employment.'" The salespersons worked for various retail outlets and would receive extra payments, known as "spiffs," from the distributor when they sold specific products supplied by the distributor. The distributor issued the spiffs to protect its share of the market place. *Id.* at 555. We determined that the spiffs were remuneration and that the distributor's business was affected by the volume of sales made by the salespeople. *Id.* at 556-57. However, we went on to explain:

> "[T]he 'benefit' of that is indirect and wholly dependent on conditions beyond petitioner's direction and control. Owners of retail outlets, who are usually the direct employers of the salespeople, benefit directly in this situation. They decide to participate or not in any given program; if they do participate, they maintain total control over how sales are made and how salespeople conduct the sales. Because petitioner has no control over how sales are made and at what prices or whether the spiff program will be implemented at a particular retail establishment, the service to the petitioner is too indirect to be intended by the act to constitute 'employment.'"

*Id.* at 557 (footnote omitted).

In this case, we conclude that the ALJ did not err in determining that petitioner was an "employing unit" and an "employer" or that the technicians were engaged in an "employment," as those terms are broadly defined under the unemployment insurance statutes. It is the amount of direction and control exerted by petitioner over the technicians that distinguishes this case from *North Pacific Supply Co., Inc.* Petitioner's business arrangement did not simply involve the payment of a finder's fee by the technicians in exchange for receiving a stream of referrals. Here, the technicians were required to abide by certain written guidelines and oral expectations given to them by petitioner at the time they were approved to begin receiving referrals. Petitioner set a common fee structure for the technicians, he provided the technicians with a common invoice form, he chose the technicians to whom he referred customer inquiries, he required the technicians to keep him apprised of any customer appointments, and he prohibited the technicians from being directly contacted by the customers, even when a customer was dissatisfied with the technician's work. Instead, all calls from customers were required to be made to petitioner. Accordingly, petitioner remained involved in the relationship between the technician and the customer throughout its duration. Indeed, the very nature of petitioner's business arrangement prevented the technicians from *independently* taking on repeat business from the customers.

The technicians' computer repair services provided petitioner with a benefit—the maintenance and growth of his market share of the computer-repair industry. In light of petitioner's control over the technicians' services, that benefit is neither too remote nor too indirect to prevent us from concluding that the technicians provided computer repair services on the behalf, or at the command, of petitioner.

■ Furthermore, given the broad policies underlying the unemployment insurance statutes, we cannot say that the manner in which the technicians received their remuneration requires a different conclusion. Petitioner's fee schedule determined not only how much the customers were charged for the technicians' services, but also how much of that amount the technicians were allowed to keep. That the customers made their checks payable in the first instance to the

technicians, rather than petitioner, does not disguise the nature of the payment: one tendered for services performed on petitioner's behalf. As we have said before, "one may be an employer for purposes of the act, even though an individual's wages are paid by someone else." *North Pacific Supply Co., Inc.*, 100 Or App at 557. We hold to that principle in this case.

Lastly, we must consider whether circumstances in this case require modification of the ordinary definitions of "employer," "employing unit," and "employment" because "the context requires otherwise," so as to prevent the services performed by the technicians from being attributed to petitioner. Unlike in *National Maintenance Contractors* and *Necanicum*, neither the parties nor this court has identified a general statutory scheme governing the operation of referral services that provides a distinguishing context. As with franchises and corporations, we appreciate that a referral service is a unique business arrangement that can differ in important ways from a traditional employment relationship. However, we are not persuaded that such arrangements demand generic exemption from the otherwise applicable definitions under ORS chapter 657.

The technicians in this case are allowed a significant degree of autonomy in aspects of their relationship with petitioner. They decide whether, when, and where to respond to the referrals that they receive, they provide their own transportation and equipment, and they are responsible for keeping their own records and for the liabilities they generate. Those facts, however, go to an issue that petitioner not only has failed to raise, but has specifically *disclaimed* any attempt to advance; that is, whether the technicians are "independent contractors" under ORS 670.600 so as to be excluded pursuant to ORS 657.040(1) from the definition of "employment." Because we conclude, as did the department and the ALJ, that, under the sweeping definition of "employment" in ORS 657.030(1), the technicians provide services for petitioner for remuneration, and because petitioner has not argued that any exclusion applies, we affirm the order of the ALJ determining petitioner to be an "employer" for purposes of ORS chapter 657.

Affirmed.