Argued and submitted January 28, affirmed on petition; on cross-petition, reversed and remanded for reconsideration of the amount of the assessment September 14, 2014, petition for review allowed February 2, 2015 (356 Or 689) See later issue Oregon Reports

## BROADWAY CAB LLC,
*Petitioner*
*Cross-Respondent,*

*v.*

## EMPLOYMENT DEPARTMENT,
*Respondent*
*Cross-Petitioner.*

Office of Administrative Hearings
T71262; A150627

336 P3d 12

Paula A. Barran argued the cause for petitioner-cross-respondent. With her on the briefs were Barran Liebman LLP and Edwin A. Harnden.

Karla Ferrall, Senior Assistant Attorney General, argued the cause for respondent-cross-petitioner. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Sercombe, Presiding Judge, and Hadlock, Judge, and Tookey, Judge.

HADLOCK, J.

**HADLOCK, J.**

Petitioner Broadway Cab LLC (Broadway) seeks judicial review of an administrative law judge's (ALJ's) final order affirming a tax assessment issued by the Employment Department. In the challenged order, the ALJ determined that Broadway, a taxicab company, had employed taxicab drivers and that the drivers' compensation was therefore subject to unemployment insurance tax, which Broadway had not paid. On review, Broadway contends that it was not required to pay unemployment insurance tax for two reasons. First, Broadway argues that its drivers did not perform services "for remuneration" during the period at issue (2008 to 2009) and, therefore, the drivers' performance of driving services did not constitute "employment" by Broadway under ORS 657.040. Alternatively, Broadway argues that, even if the drivers did perform services for remuneration, Broadway did not have an employment relationship with the drivers because they were independent contractors under ORS 670.600(2).

The department cross-petitions for review of the same ALJ order, contending that the ALJ erred in (1) concluding that the amount of assessed taxes in the notice was incorrect and (2) failing to provide the department with guidance as to what steps it should take next, as required by ORS 657.683(4).

As explained below, we affirm on Broadway's petition for judicial review. In short, we agree with the ALJ's determination that Broadway is a taxicab company that employed taxicab drivers during the relevant time period, and that it is not—as it contends—merely a "vendor of administrative services" (such as dispatch, billing, and marketing services) to drivers who are independent contractors. However, we agree with the department that the ALJ was required to affirm, modify, or set aside the department's assessment under ORS 657.683(4), and failed to do so. We therefore reverse and remand on the department's cross-petition.

## I. BACKGROUND

We describe the basic framework of Broadway's contractual relationships with public entities and with its

drivers here, along with this case's procedural history, and provide more detail as necessary later in this opinion. In doing so, we state the facts consistently with the ALJ's unchallenged factual findings and the uncontroverted evidence in the record. *AGAT Transport, Inc. v. Employment Dept.*, 256 Or App 294, 296, 305 P3d 122 (2013).

A. *Broadway's contracts with public entities*

Because they are relevant to the issues in this case, we begin our analysis by describing Broadway's relationships with the City of Portland and other public entities. The city granted Broadway a permit to provide taxicab service within city limits. Broadway's permit required that it provide service 24 hours a day, seven days a week. The permit imposed standards on the service the taxicabs provided, as well as on the visual appearance of the taxicabs. The city set maximum taxicab rates, but drivers were allowed to charge lower rates. The city retained the right to impose civil penalties if Broadway failed to meet its minimum standards of service. In addition to the city-issued taxicab company permit, the city required that each individual driver also obtain a permit. Because taxicab company permits were not issued to individuals, no person could work as a taxicab driver without associating with a taxicab company.

Broadway also had contracts with public agencies, including Tri-County Metropolitan Transportation District of Oregon (TriMet), Portland Public Schools, and Multnomah County. For the purposes of this opinion, we focus primarily on Broadway's contract with TriMet as illustrative of its contracts with other public agencies. Under the Americans with Disabilities Act (ADA), TriMet and other public transit agencies are required to provide comparable service to people who, because of a disability, are unable to use fixed-route transportation. 49 CFR § 37.121. TriMet operated its Lift Demand Response Accessible Cab Transportation Services (LIFT) program as comparable transportation to ADA-qualified customers. TriMet contracted with Broadway to provide ADA-mandated service to TriMet's ADA-qualified customers.

During the search for a taxicab company to provide transportation to its ADA-qualified customers, TriMet

requested proposals from several companies and rated each company across a variety of areas, including a company's "fleet strength." In its proposal to TriMet, Broadway touted itself as "the oldest and largest taxicab company" with "a fleet of more than 225 cars and 340 drivers." After TriMet awarded the contract to Broadway—and pursuant to that contract—TriMet required Broadway to comply with various requirements relating to driver training and customer service. In complying with those requirements, Broadway arranged for its drivers to be tested for drugs and paid them $8.00 per hour for time that they spent taking those tests. Pursuant to its ADA mandate, TriMet's contract with Broadway also required that Broadway compel its drivers to accept a trip if Broadway could not find a driver to accept the trip voluntarily. TriMet also retained the right to terminate its contract with Broadway if Broadway failed to fulfill its contractual obligations.

B.   *Broadway's arrangements with its drivers*

Broadway required all of its drivers to enter into contracts before allowing them to drive under Broadway's company permit. Broadway drafted those contracts, which all contained the same material provisions, and did not allow drivers to negotiate the terms. Some, but not all, of those contractual terms were a result of Broadway's obligations to the city and public agencies. Broadway required that all drivers sign an agreement under which each driver paid Broadway $160 per week. In exchange for that fee, each driver was included on the company's approved list of drivers, provided with liability insurance, and given access to Broadway's credit- and debit-card processing system. The fee also covered the "billing, accounting, marketing, and advertising services" that Broadway provided for each driver.

Under the contracts with Broadway, drivers also received access to Broadway's dispatch system, although they were not required to use it. In addition to being notified of potential customers through the dispatch system, drivers could accept service requests directly from customers with whom they had formed relationships, wait for customers at Portland International Airport, or hotels, or stop for customers hailing taxis on the street.

Broadway required that all new drivers attend Broadway's "Cabbie College," which Broadway described in its proposal to TriMet (as later incorporated into the contract between Broadway and TriMet) as "a rigorous week of classroom-style training." Covered topics included Broadway's policies and procedures, geography and map reading, defensive driving, customer service, vehicle operation, and bookkeeping. Drivers who successfully completed Cabbie College and passed a background check were invited to contract with Broadway. After contracting with Broadway, each driver's first week was considered "on the job training," which included meetings with Broadway's operations manager and monitoring by several Broadway staff members. Broadway sometimes required established drivers to attend Cabbie College for refresher training based on their performance.

Drivers had three options for obtaining a taxicab to use while driving for Broadway: a driver could use his or her own vehicle, lease a vehicle from Broadway, or use a vehicle owned by another Broadway driver. Drivers who owned their taxicabs operated the vehicles under Broadway's company permit. Those owner-operators were required to have their taxicabs retrofitted to Broadway's standards, which governed both interior equipment, such as seat belts and a dispatch system computer, and exterior appearance, such as having the taxicab painted in company colors with the company's full name and phone number on both sides of the vehicle. Owner-operators were also required to pay for all maintenance on their vehicles. Broadway maintained the right to require owner-operators to park their vehicles in places specified by Broadway when not in use, and to follow Broadway's procedures for taking the taxicabs in and out of service. Broadway charged each owner-operator $420 per week for using his or her own vehicle as a taxicab under Broadway's company permit, but reduced the fee to $320 if the driver agreed to let another Broadway-approved driver share the vehicle, using it when the owner-operator was not working.

As mentioned, drivers could also use vehicles that they leased from Broadway (but not from any other source); the leasing fee was $290 per week. Drivers who leased

taxicabs from Broadway were required to park the leased vehicles at Broadway's location when they were not in use. Broadway paid for the maintenance and repairs for all leased vehicles, unless damage resulted from a driver's negligence. All drivers paid for their own fuel.

Broadway maintained individual accounts for each driver on its approved list. Through those accounts, Broadway processed all noncash fares that drivers received from credit and debit cards, charges to accounts maintained by Broadway, and vouchers from public agencies.[1] Although Broadway credited each driver's account for the full amount of each fare, it also deducted its weekly fees from those accounts. Broadway allowed drivers to withdraw money from their accounts only when the accounts had positive balances. Drivers kept any cash fares they received and did not report those amounts to Broadway.

## C. *Procedural History*

In 2010, the department notified Broadway of its assessed taxes for 2008-09. *See* ORS 657.505(2) (Oregon employers must pay unemployment insurance taxes into the Unemployment Compensation Trust Fund "on all wages paid for services"). Broadway contested the assessment and requested a hearing before an ALJ. At the hearing, the ALJ considered three issues: (1) whether the taxicab drivers performed services for remuneration for Broadway under ORS 657.040(1); (2) whether Broadway's drivers satisfied the test for an independent contractor set forth in ORS 670.600(2), and were thus exempt from unemployment insurance tax; and (3) whether the department's tax assessment was correct.

The ALJ determined that the drivers did perform services for remuneration for Broadway and that Broadway had failed to demonstrate that the drivers qualified for the independent contractor exemption. Accordingly, the ALJ concluded, the drivers' performance of services for remuneration constituted taxable employment. The ALJ also concluded that the department's assessment was incorrect, but

---

[1] For example, TriMet's ADA-qualified customers provided Broadway's taxicab drivers with vouchers for their services, which the drivers then gave to Broadway. TriMet then paid Broadway for the fares represented by those vouchers under the terms of their contractual agreement.

she declined to calculate the correct amount of taxes owed for that period.

## II. ANALYSIS

Both Broadway and the department seek judicial review of the ALJ's order. In five assignments of error, Broadway asserts that the ALJ erred by concluding that: (1) the drivers performed services for Broadway under ORS 657.030(1); (2) Broadway remunerated the drivers for services under ORS 657.030(1); (3) the drivers were subject to Broadway's direction and control under ORS 670.600(2)(a); (4) the drivers did not operate independently established businesses under ORS 670.600(2)(b) and (3); and (5) the drivers did not obtain the licenses necessary to perform services as taxi drivers under ORS 670.600(2)(d). The department responds that the ALJ's conclusions were correct. The department also cross-petitions for review, arguing that the ALJ erred by concluding that the amount of assessed taxes was incorrect and that the ALJ exceeded her authority by not directing the department's actions following the proceedings under ORS 657.683(4). Broadway responds that the ALJ correctly determined that the amount of assessed taxes was incorrect because the "correct assessment would be none."

We review the ALJ's conclusions for substantial reason and errors of law. *See* ORS 657.684 ("Judicial review of decisions under ORS 657.683 shall be as provided for review of orders in contested cases in ORS chapter 183 ***."); *Freeman v. Employment Dept.*, 195 Or App 417, 421, 98 P3d 402 (2004) (providing that, pursuant to ORS 183.482(8)(a) to (c), the court reviews findings of fact for substantial evidence and legal conclusions for substantial reason and errors of law). Although we defer to the ALJ's factual findings, the "ultimate determination—whether a particular person is an employee or independent contractor—is a question of law." *AGAT Transport, Inc.*, 256 Or App at 300-01. For the reasons described below, we conclude that the facts found by the ALJ support her legal conclusions that the drivers performed services for remuneration for Broadway and that Broadway did not adequately show that the drivers qualified for the independent contractor exemption. We therefore affirm on Broadway's petition for judicial review. However,

because the ALJ did not affirm, modify, or set aside the department's assessment as required by ORS 657.683(4), we reverse and remand on the department's cross-petition.

## A. Services for Remuneration

ORS 657.030 describes "employment," in part, as *"service* for an employer * * * *performed for remuneration* or under any contract of hire * * *." (Emphasis added.) Both "service" and "remuneration" are "broad term[s] of description, evidencing a legislative intent to give to the [Unemployment Compensation] Act a broad and liberal coverage to the end that the far-reaching effects of unemployment may be alleviated." *Employment Dept. v. National Maintenance Contractors,* 226 Or App 473, 480, 204 P3d 151, *rev den,* 346 Or 363 (2009) *(NMC)* (internal quotation marks and citations omitted; brackets in original). Broadway contends both that its drivers did not provide it with services and that the drivers did not receive remuneration from Broadway.

### 1. Services

"Service," as used in ORS 657.030, refers to "an act done for the benefit or at the command of another" or the provision of "information or other assistance." *Necanicum Investment Co. v. Employment Dept.,* 214 Or App 385, 391, 164 P3d 1197 (2007), *rev'd on other grounds,* 345 Or 138, 190 P3d 368 (2008) (quoting *Webster's Third New Int'l Dictionary* 2075 (unabridged ed 2002)).

The ALJ found that Broadway was legally and contractually obligated to provide taxicab service to the city and public agencies, and she concluded that the "drivers performed services for [Broadway's] benefit" because they helped the company fulfill those legal and contractual obligations. Broadway contends that the drivers did not provide services to Broadway, or to the city on Broadway's behalf, but rather that the drivers provided services to individual passengers. Similarly, Broadway argues that it did not provide taxicab services to TriMet; in its view, Broadway's role was "solely to pass allocated funds through to operators wishing to provide services to TriMet's passengers." The department responds that the drivers did provide a service to Broadway, because "[b]ased on the way [Broadway] structured its business, the

drivers worked on Broadway's behalf by providing the transportation services to individuals that Broadway is legally obligated to provide." As explained below, we agree with the department.

Our discussion in *NMC* is illustrative. In that case, we examined whether franchisees who provided janitorial services to third-party building owners provided "services," as used in ORS 657.030, to NMC, the entity that contracted with the building owners to provide janitorial services. We explained that the janitorial services were services for NMC, because the franchisees performed the work that NMC was contractually obligated to provide to the building owners:

> "NMC entered into contracts with building owners to provide janitorial services for those buildings. NMC then entered into separate agreements whereby the franchisees would perform those janitorial services on behalf of NMC, thereby discharging NMC's contractual obligations to the building owners. That is, NMC essentially subcontracted with its franchisees to provide janitorial services to the building owners. The Supreme Court has recognized that the legislature intended the term 'service' to encompass that type of beneficial relationship, whereby an employer has contracted with an individual for personal services that discharge the employer's obligations to third parties. Accordingly, we conclude that the franchisees performed janitorial services that were for 'the benefit or at the command of' NMC, that is, services for NMC."

*NMC*, 226 Or App at 481-82 (footnotes and citations omitted).[2]

---

[2] In concluding that the franchisees provided services to NMC, we relied on several Supreme Court cases exploring similar relationships. *NMC*, 226 Or App at 482 ("*See, e.g., Journal Pub. Co.*[ *v. State U. C. Com.*], 175 Or [627,] 639[, 155 P2d 570 (1945)] (holding that a newspaper carrier provided service to the newspaper company by delivering newspapers on behalf of the newspaper company; '[i]t goes without saying that subscribers who do not receive their papers would soon cease to be subscribers'); *Columbia Management Co. v. Morgan*, 270 Or 109, 118-19, 526 P2d 571 (1974) (explaining that 'the provisions of the [unemployment compensation statutes] have been broadly construed in cases in which it has been contended that the individual persons who perform services are "independent contractors"'; also, recognizing that 'one may be the employer of an individual for the purposes of this act even though the wages of such an individual are paid by someone else, either directly or indirectly'); *see also Kirkpatrick* [*v. Peet*], 247 Or [204,] 213[, 428 P2d 405 (1967)] (door-to-door salespeople working in the capacity of 'dealers' for a vacuum distributor provided service to the distributor)." (Fourth and fifth brackets in *NMC*.)).

This case involves relationships analogous to those at issue in *NMC*. The taxicab drivers here provided services to Broadway that allowed the company to fulfill its obligations to the city and other public entities. Specifically, when Broadway applied for a taxicab company permit from the city, Broadway agreed to fulfill taxicab service requests received from any location within the city, 24 hours per day, seven days per week. Additionally, when Broadway entered into contracts with TriMet and other public agencies, it contractually obligated itself to provide taxicab services to those agencies' customers. Broadway could not fulfill its contractual and legal duties without the services provided by the taxicab drivers. Further, if Broadway did not meet those requirements, it faced the possibility of civil penalties imposed by the city and the loss of its contracts with the public agencies.

Broadway nonetheless argues that the drivers did not perform services for Broadway. Instead, it argues, Broadway performed services for the drivers, for which the drivers paid Broadway weekly fees. In *Gross v. Employment Dept.*, 237 Or App 671, 240 P3d 1130 (2010), the putative employer argued, as Broadway does here, that it was merely a referral service that connected customers who needed computer repair services with technicians who could provide those services. We disagreed, concluding that the putative employer derived a benefit from the performance of technicians' services and that the services were not too indirect to constitute taxable employment:

> "The technicians' computer repair services provided petitioner with a benefit—the maintenance and growth of his market share of the computer-repair industry. In light of petitioner's control over the technicians' services, that benefit is neither too remote nor too indirect to prevent us from concluding that the technicians provided computer repair services on the behalf, or at the command, of petitioner."

*Id.* at 686.

Likewise, here, the drivers' services not only allowed Broadway to meet its contractual and legal obligations, but also provided Broadway with the added benefit of maintaining and growing its market share of the taxicab business in

the metropolitan area, allowing it to promote itself as "the oldest and largest taxicab company" with "a fleet of more than 225 cars and 340 drivers." To that end, Broadway remained "involved in the relationship" between driver and customer, handling customer complaints about drivers and imposing fines if Broadway found the drivers did not meet Broadway's expectations. Additionally, if Broadway receives additional business from customers, it presumably will be able to support additional taxicab drivers, resulting in additional weekly fees from those extra drivers paid to Broadway. And given Broadway's assertion that it is the oldest and largest taxicab company in the city, maintaining a large fleet of drivers is essential to maintaining its position in the industry.[3]

For all of those reasons, we conclude that Broadway's drivers provided "services" to Broadway, as that term is used in ORS 657.030.

### 2. *Remuneration*

As noted, to constitute "employment," under ORS 657.030 services must be provided "for remuneration." "Remuneration" commonly refers to "pay[ing] an equivalent to (a person) for a service, loss, or expense." *Necanicum Investment Co.*, 214 Or App at 391 (quoting *Webster's* at 1921) (brackets in *Necanicum Investment Co.*). Here, the ALJ found that drivers received remuneration for their services to Broadway; that is, the amount of the difference between the fares collected by drivers and the weekly fees owed to Broadway. The ALJ reasoned that "ORS 657.030(1) does not require the putative employer to remunerate directly for the services. It only requires that the services be 'performed for remuneration.' Thus, the issue is not who provided remuneration to the drivers but whether they received remuneration for services performed." On judicial review, Broadway argues that the passengers, not Broadway, hired and paid

---

[3] The type and extent of benefits that Broadway receives from the drivers' services—particularly the drivers' importance in allowing Broadway to fulfill its legal and contractual obligations and to maintain its industry position—distinguish this case from the hair-salon cases on which Broadway relies. *See Golden Shear Barber Shop v. Morgan*, 258 Or 105, 112-13, 481 P2d 624 (1971) (a "bona fide space-sharing arrangement," not an employment relationship, existed where the amount of business done by a barber made no difference to his putative employer); *Employment Division v. Shear Creations Salon*, 94 Or App 107, 110, 764 P2d 941 (1988) (analogizing case to *Golden Shear*).

the drivers. Thus, according to Broadway, no employment relationship existed given that Broadway offered its services to drivers in exchange for a flat fee, "without regard to how much or how little [a driver] actually earned in fares." The department responds that the "source of the drivers' remuneration is immaterial" because the drivers are remunerated for services provided to Broadway. For the reasons set out below, we conclude that the ALJ did not err in determining that the drivers were remunerated for their services to Broadway.

Broadway's focus on the flat-fee arrangement is too narrow. In determining whether a worker receives remuneration for services, the critical issue is not the specific nature of the fee arrangement but instead whether payments that the workers receive are "for services performed on [the putative employer's] behalf." *Gross*, 237 Or App at 687. And whether the services are "performed on [the putative employer's] behalf," relates back to whether the workers' services *benefit* the putative employer. Here, the ALJ determined that Broadway "directly benefited" from its drivers' services. The drivers' services allowed Broadway to fulfill the city's requirements and retain its taxicab company permit. Without the drivers, Broadway would have been unable to provide taxicab services in the city, which would have violated the city's requirements and subjected Broadway to civil penalties and a revocation of its permit. Without the company permit, Broadway would have lost its ability to provide transportation services and its ability to contract with public agencies and other entities. That loss would have affected Broadway's ability to attract and retain drivers. Without drivers, Broadway would have lost its income from drivers' fees, which constituted 91.5% of its revenue.

Moreover, it does not matter that the drivers' customers, not Broadway, paid the drivers for their services.[4] In *Gross*, we explained that, even when "the customers made their checks payable * * * to the technicians, rather than [the

___

[4] We also note that only the public paid the drivers directly. As the ALJ found, TriMet customers paid drivers with vouchers, which the drivers then turned in to Broadway for payment. Broadway "billed agencies and other entities, collected the money, deducted fees, and only paid drivers when they had a remaining balance."

employer, it] does not disguise the nature of the payment: one tendered for services performed on [the employer's] behalf." 237 Or App at 686-87. We went on to explain that, "[a]s we have said before, 'one may be an employer for purposes of the act, even though an individual's wages are paid by someone else.'" *Id.* at 687 (quoting *North Pacific Supply Co., Inc. v. Emp. Div.*, 100 Or App 553, 557, 787 P2d 495, *rev den*, 310 Or 121 (1990)). That principle applies to this case. As the ALJ noted, the issue is "whether they received remuneration for services performed," not whether the remuneration came directly from the employer.[5] Although some customers paid their fares directly to the drivers, those payments were for services that the drivers performed on Broadway's behalf while operating taxicabs marked with Broadway's name and colors.

Accordingly, the ALJ correctly concluded that the drivers received remuneration for their services to Broadway.

B. *Independent Contractor Exemption*

Broadway also asserts that the drivers are not its employees because they fall within the statutory "independent contractor" exemption to the definition of "employment." ORS 657.040(1) ("Services performed by an individual for remuneration are deemed to be employment" for unemployment insurance tax purposes unless "it is shown to the satisfaction of the Director of the Employment Department that the individual is an independent contractor."). For purposes of unemployment insurance, an "independent contractor" is a person "who provides services for remuneration and who, in the provision of the services":

"(a)   Is free from direction and control over the means and manner of providing the services, subject only to the right of the person for whom the services are provided to specify the desired results;

"(b)   * * * [I]s customarily engaged in an independently established business;

---

[5] The ALJ also observed that Broadway retained control over the drivers' accounts and therefore it made no difference whether Broadway "took the money and gave drivers the difference between the fares they collected and the fees they paid to [Broadway] or whether drivers retained all remuneration except the fees owed to" Broadway.

"(c)   Is licensed under ORS chapter 671 or 701 if the person provides services for which a license is required under ORS chapter 671 or 701; and

"(d)   Is responsible for obtaining other licenses or certificates necessary to provide the services."

ORS 670.600(2). Broadway had the burden to establish that its drivers met each of those criteria. ORS 657.683(4); *Avanti Press v. Employment Dept. Tax Section*, 248 Or App 450, 456, 274 P3d 190 (2012).

Because it is dispositive, we begin and end by examining the "independently established business" criterion that must be met for independent contractor status under ORS 670.600(2)(b). A person is "considered to be customarily engaged in an independently established business if any three of the following [five] requirements are met":

"(a)   The person maintains a business location:

"(A)   That is separate from the business or work location of the person for whom the services are provided; or

"(B)   That is in a portion of the person's residence and that portion is used primarily for the business.

"(b)   The person bears the risk of loss related to the business or the provision of services * * *[.]

"* * * * *

"(c)   The person provides contracted services for two or more different persons within a 12-month period, or the person routinely engages in business advertising, solicitation or other marketing efforts reasonably calculated to obtain new contracts to provide similar services.

"(d)   The person makes a significant investment in the business * * *[.]

"* * * * *

"(e)   The person has the authority to hire other persons to provide or to assist in providing the services and has the authority to fire those persons."

ORS 670.600(3). As explained below, we conclude that the ALJ did not err in determining that Broadway did not meet

at least three of those five criteria. In particular, we conclude that Broadway did not meet its burden to establish that its drivers maintained a separate work location, routinely engaged in advertising and marketing, or had the authority to hire and fire others. Accordingly, the ALJ correctly concluded that the drivers were not engaged in independently established businesses.

### 1. *Business location*

The first question posed by ORS 670.600(3) is whether the workers maintained a business location either "separate from the business or work location of the person for whom the services are provided" or located "in a portion of the person's residence [that] is used primarily for the business." ORS 670.600(3)(a). At the hearing before the ALJ, Broadway argued that each driver's "location" was his or her vehicle, which Broadway asserted was physically separate from Broadway's location. The ALJ concluded that Broadway failed to prove that element, finding that the vehicles were not separate from Broadway's location:

> "Even if the vehicles qualify as 'location,' the vehicles were not separate from [Broadway's] business because they were marked with [Broadway's] colors and numbers, and were really an extension of [Broadway's] business. Thus, none of the drivers had a separate business location. Additionally, [Broadway], and not lease drivers, maintained the leased vehicles. Finally, during the period in issue, all drivers used the vehicles exclusively to provide services to [Broadway]. Thus, they did not conduct any business separate from [Broadway's] business."

On judicial review, Broadway reprises its arguments made to the ALJ. The department responds that "physical separation from the employer is only one aspect of that factor. The fact that a worker provides services by driving a vehicle—whether cab, delivery van, airplane, or barge—rather than working at an office should have no bearing on whether that worker is an independent contractor." The department also contends that the "critical question is whether the worker *conducts business* in his or her own separate space." (Emphasis in original.) We agree with the department.

"[A] business location must be *both* 'maintained' by the person *and* 'separate from the business or work location of the person for whom services are provided.'" *Compressed Pattern, LLC v. Employment Dept.*, 253 Or App 254, 260, 293 P3d 1053 (2012) (emphasis in original). For example, in a case when a worker used the space and equipment of another organization for free, he did not "maintain" that work space. *Id.* at 261. In this case, although Broadway's "lease drivers" did pay for the right to use Broadway's vehicles, they had access to the vehicles for only 12 hours a day, with Broadway controlling who had access to the vehicle during other hours. Broadway provided the vehicles and paid for all required maintenance and retrofitting to city standards. Those factors suggest that Broadway, not the drivers, maintained the vehicles as part of its business. With respect to owner-operated vehicles, although the owners were responsible for their own vehicle maintenance, Broadway still exerted considerable control. The owner-operators had to pay Broadway $420 per week for the right to use their own vehicles. Broadway also had the right to control where the owners parked their vehicles when they were not in use. Moreover, no matter where the taxicabs were located at any time of day, they still were marked with Broadway's name and colors. Thus, although Broadway may not have "maintained" those vehicles, they were an extension of Broadway's business, not "separate" from it.[6]

---

[6] Broadway additionally argued to the ALJ, and argues on judicial review, that the "business location" factor is met because two drivers maintained a business location that is in a "portion of the person's residence and that portion is used primarily for the business." ORS 670.600(3)(a)(B). The ALJ found that Broadway "did not demonstrate that the *majority* of its drivers set aside a portion of their residences and used it primarily for the business. * * * [Broadway] did not demonstrate that it met the criteria set forth in ORS 670.600(3)(a) other than for two of its drivers." (Emphasis added.) On review, Broadway does not argue that those two drivers should be treated differently from the group of drivers as a whole. That is, Broadway does not argue that it should not have to pay unemployment insurance tax for those two drivers even if it is required to pay that tax for all of its other drivers. Instead, Broadway argues that, because two of the drivers maintained home offices, *all* drivers should be considered to have done so. We do not agree that evidence that two drivers—out of an advertised fleet of 340 drivers—maintained home offices is sufficient to establish that the drivers *as a group* maintained home offices, and we reject Broadway's argument in that regard. We express no opinion on whether the type of home offices maintained by those two drivers would be sufficient to meet the requirements of the "business location" factor if we considered those drivers separately from the group.

## 2. *Routinely engages in advertising and marketing*

Another of the five "independently established business" criteria requires consideration of whether the drivers "routinely" engaged in "business advertising, solicitation or other marketing efforts reasonably calculated to obtain new contracts to provide similar services."[7] ORS 670.600(3)(c). With respect to that factor, the ALJ made the following relevant findings of fact:

> "[D]rivers did not individually advertise their services as taxi drivers. * * * Some drivers used pre-printed business cards with [Broadway's] name and address, but with space for drivers to write their own names and telephone numbers. A few drivers had personalized cards with their names and phone numbers. Some of the personalized cards did not have [Broadway's] name and telephone number. Some drivers gave their contact information to some passengers to whom they provided services, if the passengers asked for the information. Drivers made the contact with the passengers while operating vehicles with [Broadway's] name and telephone numbers. At times, passengers called drivers directly rather than contacting [Broadway]. Drivers considered these customers to be their personal customers."

Drivers providing transportation under Broadway's TriMet contract were not permitted to solicit additional business from those passengers.

Based on those facts, the ALJ determined that, although some drivers engaged in business advertising, they were actually advertising *Broadway's* business, not their own. Ultimately, the ALJ concluded that the "drivers did not have a business" and therefore "could not engage in *business* advertising." (Emphasis in original.) "Thus, any advertising, solicitation or other marketing efforts they engaged in only promoted [Broadway's] business as none of the drivers could personally provide any service without [Broadway's] brand." On judicial review, Broadway argues that the drivers "routinely engaged in individual marketing efforts by passing out business cards with their names and

---

[7] Broadway does not challenge the ALJ's determination that "evidence does not demonstrate that [drivers] provided contracted services for two or more different persons within a 12-month period," that is, that the other prong of ORS 670.600(3)(c) was not satisfied.

contact information so that customers could contact them directly instead of using Broadway's dispatch service." The department responds that "passing out personal contact information to customers who request it does not qualify" as business advertising because the drivers "could not legally provide transportation services except under Broadway's auspices."

The exact nature of Broadway's challenge to this aspect of the ALJ's order is unclear. To the extent that Broadway may mean to suggest that evidence in the record establishes conclusively that drivers "routinely" engaged in individual marketing efforts, we conclude that the record does not compel such a finding. The ALJ found that only "[s]ome drivers" used Broadway business cards that also had space where the drivers could write their own names and telephone numbers, that only "[a] few" drivers had personalized business cards, and that only "[s]ome" of those personalized cards did not also have Broadway's contact information. Broadway does not challenge those findings, which are supported by the record and which we find sufficient to establish that the drivers did not "routinely" engage in individual marketing efforts.

We also reject any contention that drivers' efforts to market Broadway's services, rather than their own, would satisfy the ORS 670.600(3)(c) "business advertising" criterion. That criterion, like the others in ORS 670.600(3), is meant to help determine whether a putative independent contractor actually has an "independently established business." To establish that criterion, a person's "routine" marketing efforts must be undertaken to help that person "obtain new contracts to provide similar services," not to promote the services of another organization. ORS 670.600(3)(c). Here, any advertising efforts that the drivers undertook would, in the end, promote Broadway itself, given that the drivers drove solely for that company in taxicabs marked with the company's name and colors. Given those facts, and the ALJ's findings establishing that drivers did not "routinely" advertise their individual services, the ALJ did not err in concluding that the "advertising and marketing" factor was not met.

### 3. *Authority to hire and fire*

Another of the five "independently established business" criteria is that the putative independent contractor have "authority to hire other persons to provide or to assist in providing the services and has the authority to fire those persons." ORS 670.600(3)(e). Here, Broadway presented evidence that drivers had the authority to hire other people, such as mechanics, accountants, and other professionals. However, the ALJ concluded that the "statute requires that the person hired provide or assist in providing the services, which here related to operating a taxi. Thus, the drivers' ability to hire other professionals did not satisfy the requirement." The ALJ found that owner-operators had the ability to choose a second driver for their vehicle, but that the "authority was limited to choices from [Broadway's] list of approved drivers." The ALJ also explained that the owner-operators "did not have the right to fire second drivers because that right rested with" Broadway. Broadway "decided whether to add second drivers to its approved list, whether second drivers qualified to provide agency trips, whether to suspend or fine second [drivers] and ultimately, whether to remove second drivers from its approved list."

On judicial review, Broadway argues that the ALJ read the statute too narrowly and that the drivers must only be able to hire someone to *assist* in providing the service, not, as the ALJ found, someone else to *provide* the service. In response, the department argues that the "service" that the drivers provide is driving a taxicab and therefore "providing accounting or mechanical work" was "only tangentially (and infrequently) related to the driving services that they provided." Again, we agree with the department.

*Portland Columbia Symphony v. Employment Dept.*, 258 Or App 411, 427-28, 310 P2d 1139 (2013), informs our analysis. We concluded in that case that certain orchestra musicians were independent contractors, in part, because they had the contractual right to hire other musicians to perform their work. If they were unable to attend a rehearsal or performance, they contacted a personnel manager who would then arrange for a replacement. The original musician could make a recommendation for the replacement, but

the orchestra had a right to veto the selection. The original musicians did not directly pay their substitutes (presumably they were paid by the orchestra directly). We held that the musicians met the "authority to hire and fire" factor despite the fact that the original musicians did not directly pay their substitutes and notwithstanding the orchestra's "veto power" over the musicians' proposed replacements. *Id.* at 428.

Here, in contrast, Broadway's drivers do not hire other drivers to perform identical services in their stead. Rather, owner-operators may only select a pre-approved secondary driver to share their vehicles and offset costs. Those secondary drivers are not *substituting* for the owner-operators (as did the replacement musicians in *Portland Columbia Symphony*); instead, the secondary drivers provide services *in addition* to those provided by the owner-operators. Thus, the ALJ correctly determined that the "second drivers" are not "assist[ing]" the regular drivers "in providing the services" that the regular drivers perform, as ORS 670.600(3)(e) requires. Moreover, Broadway's drivers also have no authority to fire secondary drivers once they have selected them—only Broadway has that authority.

Broadway also emphasizes that drivers are able to hire and fire their own mechanics and accountants without Broadway's "advice, interference, or control." We conclude that the ALJ did not err in determining that the drivers' ability to hire other professionals did not satisfy the "authority to hire and fire" factor.

First, we reject the notion that a person's ability to hire an accountant—a kind of professional whose services anybody might need—indicates that the person operates an "independently established business." Second, under the circumstances presented in this case, the drivers' authority to hire mechanics to maintain the vehicles they own or lease from Broadway does not establish that those drivers have authority to hire others "to provide or to assist in providing *the services*" as ORS 670.600(3)(e) contemplates. (Emphasis added.) All manner of employees require the help of others in maintaining tools that they must use in the course of their employment. For example, medical professionals

may supply and maintain their own stethoscopes, lawyers may supply and maintain some of their own computer equipment (like tablets or smart phones), law enforcement officers may be required to supply and maintain their own duty weapons and handcuffs, and sales clerks at high-end stores may be required to wear professional clothing that is costly to purchase and keep clean. That does not mean that medical-equipment repairers, computer professionals, gunsmiths, or dry cleaners assist in performing "the [medical, legal, law-enforcement, or sales] services" within the meaning of ORS 670.600(3)(e). Similarly, any mechanics that the drivers hired to maintain the taxicabs did not assist the drivers in providing their *driving* services. For both of those reasons, we conclude that the fact that drivers could choose which mechanics to perform work on the taxicabs does not demonstrate that the drivers have authority to hire people to assist them in performing "the services" in a way that helps establish that the drivers operate independently established businesses for purposes of ORS 670.600(3).

In sum, the ALJ correctly concluded that Broadway did not prove at least three out of the five factors indicating that the drivers were operating an independently established business. Accordingly, the ALJ did not err in determining that the drivers were not independent contractors under ORS 670.600(3).

C. *Cross-Petition*

The department's cross-petition for judicial review challenges the ALJ's refusal to affirm, modify, or set aside the department's tax assessment, which the ALJ simply declared to be "incorrect." The ALJ found that the department calculated taxable payroll for each driver by taking the total amount of money (cash and credit- and debit-card deposits) that the driver deposited into his or her account with Broadway, then subtracting the driver's weekly fees, resulting in net earnings. The ALJ found that calculation problematic, primarily because neither Broadway nor the drivers kept accurate reports of drivers' fares (particularly those paid in cash) and "it is difficult to determine which [credit- and debit-card charges credited to drivers' accounts] were from the drivers' own credit/debit cards [to pay their

weekly fees] and which were from customer credit/debit cards." Based on those difficulties, the ALJ determined that Broadway had rebutted the statutory presumption that the department's tax assessment was correct, but the ALJ declined to do anything other than declaring the assessment to be incorrect:

"Regardless of what method is used for calculation, the taxable payroll will not accurately reflect drivers' earnings unless drivers show the amounts they brought in cash and the amounts they charged to their own credit/debit cards to pay their weekly fees (including fines and penalties) during each week during the period in issue.

"* * * While [Broadway] rebutted the presumption that the Department's tax assessment was correct, neither the Department nor [Broadway] provided evidence at the hearing regarding drivers' earnings. Thus, the ALJ lacks substantial evidence to determine driver remunerations and [Broadway's] taxable payroll.

"Additionally, while under ORS 657.681(2), the Department has the authority to estimate the amount of wages paid during periods for which no report was filed and make assessments based on such estimates, the ALJ does not have the same authority. Accordingly, the ALJ is without jurisdiction to determine Appellant's taxable payroll for the period in issue.

"* * * * *

"* * * The Notice of Assessment * * * is incorrect."

In its cross-petition for judicial review, the department challenges both the ALJ's determination that Broadway rebutted the statutory presumption that the department's tax assessment was correct and the ALJ's refusal to affirm, modify, or set aside that assessment as ORS 657.683(4) requires.[8] Despite the ALJ's concerns about the accuracy of the assessment, the department argues, the ALJ should have affirmed the assessment because to do otherwise would essentially reward Broadway for not having maintained accurate payroll records:

---

[8] ORS 657.683(4) directs that, after that hearing, the ALJ "shall enter the findings of fact and decision, either affirming, modifying, or setting aside the * * * assessment of the director or authorized representative and * * * the administrative law judge may increase or decrease the amount of the assessment."

"The department's authority to act upon an estimate when an employer fails to keep and provide payroll records would be useless if the ALJ cannot enforce those estimates on appeal when the employer does not come forward with additional and more accurate information. If the ALJ's solution here is upheld, an employer would always be able to avoid tax assessments by withholding information during an audit and then revealing only enough information in the hearing to cast doubt on the accuracy of the department's estimate. That cannot be what the legislature intended."

At the very least, the department argues, the ALJ inappropriately failed to "provide any guidance to the agency as to what steps it should take with regard to the notice of assessment." In response, Broadway supports the ALJ's determination that the assessment was incorrect, but it appears to agree with the department that the ALJ should have ordered a remedy (according to Broadway, setting aside the assessment) rather than simply declaring the assessment to be incorrect.

As explained below, we agree with the department to some extent. An employer cannot escape liability for a tax assessment simply by pointing to theoretical limitations on the accuracy of that assessment. Nor can the employer prevail simply by asserting that an assessment *might be* incorrect because its own failure to maintain records makes determination of a precisely correct assessment impossible. As the ALJ pointed out, the department may "estimate the amount of wages paid * * * and make assessments based on such estimates," at least when no more precise calculation is possible. *See* ORS 657.681(2) (when employer fails to file a report for the purpose of calculating unemployment taxes, the department "may make an estimate based upon any information of the amount of wages paid for employment * * * and upon the basis of such estimate shall compute and assess the amount of employer contributions payable"). Rather, to overcome the presumption that the department's assessment is correct, the employer has the burden of proving that the assessment is *actually* incorrect. ORS 657.683(4). And an ALJ's finding that the employer has met that burden must be supported by substantial evidence in the record. *Sports Clubs, LLC v. Employment Dept.*, 235 Or App 630, 637, 234 P3d 136 (2010).

The difficulty with the ALJ's order in this case is that it states *both* that the record does not include substantial evidence on which an accurate assessment could be based *and* that the department's assessment is incorrect. Those statements create some tension—as noted, an employer cannot prove that the department's assessment is actually incorrect simply by pointing to hypothetical inaccuracies based on the employer's failure to maintain accurate payroll records. Accordingly, to the extent that the ALJ based her determination that the department's assessment is incorrect solely on an absence of records more precisely establishing the driver's earnings (which seems to be suggested by the statement that the record "lacks substantial evidence" on that point), the ALJ erred, and she should have affirmed the department's assessment. However, if the ALJ meant to say that the record includes evidence showing that the department's calculation *in fact* was incorrect and *could have been* calculated more precisely (for example, through evidence showing that specific drivers earned more or less than their Broadway accounts reflected), the ALJ should have either modified that assessment, by increasing or decreasing it as ORS 657.683(4) contemplates, or set the assessment aside. In either case, the ALJ erred by simply declaring the assessment to be inaccurate without specifying further action.

### III.   CONCLUSION

We conclude that the ALJ correctly determined that the drivers provided services to Broadway for remuneration and were not independent contractors. Therefore, the drivers' compensation was subject to unemployment insurance tax. We also conclude that the ALJ erred by not affirming, modifying, or setting aside the assessment as required under ORS 657.683(4).

Affirmed on petition; on cross-petition, reversed and remanded for reconsideration of the amount of the assessment.